NEW YORK STATE NATURAL GAS
CORPORATION, Plaintiff

v.

SWAN–FINCH GAS DEVELOPMENT
CORPORATION and Rockton Drilling
Corporation, A. H. Reitz and Keta Gas
& Oil Company, Defendants.

Civ. A. No. 15514.

United States District Court
W. D. Pennsylvania.

March 31, 1959.

William H. Eckert, Cloyd R. Mellott, Eckert, Seamans & Cherin, Pittsburgh, Pa., for plaintiff.

Robert V. Maine, DuBois, Pa., Robert E. Kline, Rothman, Gordon & Foreman, Pittsburgh, Pa., for defendants.

Pentz, Ammerman & Blakley, DuBois, Pa., for intervenor.

WILLSON, District Judge.

In this non-jury civil action, this court must determine the ownership of the natural gas in a tract of land of approximately 1,050 acres, being Warrant 2001, Houston Township, Clearfield County, Pennsylvania.

The case was filed in this court because of the dispute between New York State Natural Gas Corporation, a corporation existing under the laws of the State of New York, and defendant Swan-Finch Gas Development Corporation, a Pennsylvania corporation, over which one had the right to drill for and produce natural gas from this warrant. Each corporation had started drilling operations. Defendant A. H. Reitz is an individual and claims to be the owner in fee of the natural gas. She leased the land for drilling purposes to Swan-Finch. Rockton Drilling Corporation is a Pennsylvania corporation claiming an interest in the gas through Swan-Finch. Keta Gas & Oil Company, a Pennsylvania corporation, claims to be an assignee of the interest of Swan-Finch. The matter in controversy exceeds the amount required for diversity jurisdiction. Six gas wells drilled to the Oriskany sands by plaintiff are now producing gas from this land. A preliminary injunction was granted against defendants, prohibiting them from drilling and completing a well commenced in January of 1957. Plaintiff was permitted to continue to drill the well it had started in December of 1956. The Court, however, imposed certain drilling conditions upon the plaintiff. In due course, this case came on for trial on the merits. Counsel have been heard at oral argument and briefs have been filed. Upon all of the evidence and the law applicable thereto, this court has concluded that the ownership of the natural gas is in the plaintiff.

Since December 29, 1904, the surface of Warrant 2001 has been owned by the Commonwealth of Pennsylvania and, says the plaintiff, the gas estate by the heirs of Cyrus Gordon. The Gordon heirs gave an oil and gas lease covering this warrant to Godfrey L. Cabot, Inc. in 1951, which has been assigned by the lessee therein to the plaintiff in this case. It is through the Gordon title that plaintiff claims the right to produce and sell gas from this warrant. Defendants claim through a deed to the Caledonia Coal Company. For convenience, their chain of title is designated "Caledonia Coal title." The conveyances making up both chains of title appear in the findings of fact, but as this court holds that plaintiff has a good title to the gas, it necessarily follows that the conveyances on which defendants rely to establish their title are rejected as being insufficient in law. As no well was completed, nor was any gas produced from this warrant until 1957, and as both parties rely on paper titles, possession plays no part in the conclusion as to ownership of the gas.

The common source of title is the ownership of this warrant on and prior to April 5, 1887, by Benjamin C. Bowman and James H. Rowland. The parties agree that the Bowman and Rowland title is good and that it was held in fee simple by the owners. On April 5, 1887, Bowman and Rowland gave a deed to the

Caledonia Coal Company. The principal, if not the decisive point in this case, is whether the deed to the Caledonia Coal Company passed title to the natural gas in this warrant. The granting clause reads:

"* * * do grant, bargain, sell, alien, enfeoff, release and convey unto the same Caledonia Coal Company its successors and assigns, *All the coal, coal oil, fire clay and other minerals of every kind and character,* in upon and under the following described tracts of land * * *." (Italics are in original deed, according to the certified copy offered in evidence.)

one of which is Warrant 2001 in Houston Township. This deed also contained the following language:

"* * * together with the right and privilege of entering upon said land and taking away said coal, coal oil, fire clay and other minerals of every kind and character, and to erect such structures, ways, buildings, railways, and shafts thereon both up and down, to cut and fill the surface wheresoever needed for railways, for such purposes to dig ditches and channels for waste waters and to do those and such other things thereon in such manner as may be necessary in the judgment of the Caledonia Coal Company to successfully mine and take away the said coal, coal oil, fire clay and other minerals or any of them from the lands aforesaid with the right to use such timber under ten inches in diameter * * *."

Defendants' contentions are:

1. That the deed to the Caledonia Coal Company passed title to the natural gas and that thereafter the "mineral" assessments which appear in defendants' chain of title and on which certain tax sales have been based give defendants an unbroken paper title to the natural gas.

2. That even if the Caledonia Coal Company deed does not pass title to the

natural gas, then the Treasurer's deed dated September 28, 1898, granting this warrant and conveying the minerals in this Warrant 2001 to H. H. Pigott for unpaid taxes for the years 1896 and 1897, passed title to the natural gas. Subsequent to this deed, say the defendants, several tax sales based upon "mineral" assessments and other conveyances show an unbroken chain of title in defendants' predecessors.

Plaintiff contends that the Caledonia Coal Company deed did not pass title to the natural gas and that the "mineral" assessments are assessments of the coal, coal oil, and other things conveyed in the Caledonia Coal Company deed, but are not assessments of the natural gas, and therefore the Treasurer's deed of September 28, 1898 to H. H. Pigott does not help defendants insofar as the gas is concerned.

It should be stated at this point that at no time has the natural gas as such in this warrant been assessed by the Clearfield County authorities. If title to the gas passed by virtue of a Treasurer's deed, it must have passed under an assessment designated "mineral." It therefore becomes necessary to examine the law relative to what was conveyed in the deed to the Caledonia Coal Company and what was thereafter assessed by the authorities of Clearfield County.

I. Caledonia Coal Company Deed and "Mineral" Assessments Thereafter

Defendants assert that as gas is unquestionably a mineral, title to it passed under the language or phraseology in the Caledonia Coal Company deed, "* * * and other minerals of every kind and character * * *." The law of Pennsylvania controls the decision in this case. It appears to this court that the language used in the Caledonia Coal Company deed has been construed by the Supreme Court of Pennsylvania in a line of cases beginning in 1882, as not including the gas: Dunham v. Kirkpatrick, 1882, 101 Pa. 36; Silver v. Bush, 1906, 213 Pa. 195, 62 A. 832; Preston v. South Penn Oil Company, 1913, 238 Pa. 301, 86

A. 203; Bundy v. Myers, 1953, 372 Pa. 583, 94 A.2d 724, 725.

The decision in Bundy v. Myers, supra, was announced by the Pennsylvania Supreme Court in 1953. The defendants there claimed the gas in a reservation in a deed reading as follows:

"Excepting and reserving, out of this land, the oil, coal, fire clay and minerals of every kind and character with rights of entry for the purpose of removal of the same * * *."

It will be noted that oil was expressly included in the reservation. The Supreme Court held that the above language did not include the gas and that therefore the defendant had no right to it. The applicable principle was stated by the Supreme Court as follows:

"In construing the reservation, two basic principles of long standing are to be borne in mind: * * * (2) that the law of Pennsylvania recognizes the existence of a rebuttable presumption that the word 'mineral', when used in a deed reservation or exception, does not include oil or natural gas." [Citing cases]

■ That the word "minerals" does not include gas has become a rule of property in Pennsylvania, which is not to be disturbed. To that effect the Supreme Court in the recent Bundy case said:

"Dunham v. Kirkpatrick has now been the law of this State for seventy years and is still no less a rule of property which is not to be disturbed."

■ It was also held in the Bundy case that to take any case out of the operation of the rule that the word "minerals" does not include gas requires evidence that is clear and convincing. So holding, the Supreme Court in the Bundy case quoted from Silver v. Bush, supra, as follows:

" 'To take any case out of its operation the evidence should be clear and convincing that the parties used the words in a different sense.' "

The defendants in Bundy v. Myers, supra, argued, just as the defendants do in the instant case that because coal oil was expressly reserved, therefore the gas was intended to be reserved also, since it is well known that natural gas and oil are usually found together. The Supreme Court rejected that argument in language which is equally applicable to the case at bar, as follows:

"Their [defendants'] contention that, under the rule of *ejusdem generis*, the reservation included natural gas in that it was as much a mineral as the oil which was expressly reserved, is untenable. If the oil and gas were intended to be included in the 'minerals' reserved, then why was the oil expressly reserved? *Expressio unius est exclusio alterius.*"

The instant case is a weaker one for the defendants than was Bundy v. Myers, supra, on the point just considered, because the oil referred to in the deed from Bowman and Rowland to the Caledonia Coal Company was not oil generally, but only "coal oil." Coal oil years ago referred to an oil produced by the destructive distillation of bituminous coal: Bacon & Hamor, American Petroleum Industry, Volume 1, page 11, Footnote 5. Coal oil is therefore a more limited and restricted substance than petroleum oil, which is the type of oil usually found with gas.

Dunham v. Kirkpatrick, 101 Pa. 36, the first case on the subject, was decided in 1882, which was before the deed from Bowman and Rowland to the Caledonia Coal Company. In that case it was held that the words "all minerals" did not include oil. After acknowledging that all inorganic substances are technically classed as minerals, the Supreme Court said:

"Certainly, in popular estimation petroleum is not regarded as a mineral substance any more than is animal or vegetable oil, and it can, indeed, only be so classified in the most general or scientific sense. How, then, did the parties to the

contract under consideration, think and write? As scientists; or as business men, using the language and governed by the ideas of everyday life?"

The opinion concludes as follows:

"But if they did entertain such an idea (that there was oil under the land), and expected to reserve oil under the general term 'mineral,' they were mistaken, and should have known that they were using that word in a manner not sanctioned by the common understanding of mankind, hence, in a manner that could not be approved by the courts of justice."

In Silver v. Bush, 1906, 213 Pa. 195, 62 A. 832, 833, it was held that gas was not included in the words "the mineral underlying" certain land. Again it was conceded that under the broad division of all matter into the three classes of animal, vegetable and mineral, oil and gas were minerals. After referring to Dunham v. Kirkpatrick, supra, in which it was held that the words "all minerals" did not include oil, the Supreme Court said:

"And, a fortiori, natural gas would not be so included. This decision was part of the law of the state when the deeds in question were made, and to some extent at least, as was said by the learned judge below, it had become a rule of property on which many titles in Western Pennsylvania rested. To take any case out of its operation the evidence should be clear and convincing that the parties used the words in a different sense."

At the trial of Silver v. Bush, supra, the plaintiffs, who were there claiming the gas under the word "mineral," offered to prove that at the time the deed in question was given (1891), land in the vicinity was already being developed for natural gas, which was known as a marketable commodity. The exclusion of these offers was held to be correct by the Supreme Court. Apropos this, the Supreme Court said:

"These offers, however, even if proved, were not evidence that the parties used the term 'mineral' in the sense contended for. They could only be ground for inference that the parties might have so intended, while, on the other hand, the offers themselves implied that the including of gas under the term 'mineral' would be a new use of the term, and the inference would be strong that, if the parties intended to include gas, they would have said so expressly. The offers, therefore, were properly excluded."

In Preston v. South Penn Oil Company, 1913, 238 Pa. 301, 86 A. 203, it was held that the words "all mineral and mining rights and the incidents thereto whatever" did not include petroleum or natural gas. The opinion concludes as follows:

"Dunham v. Kirkpatrick has been the law of this state for 30 years and very many titles to land rest upon it. It has become a rule of property, and it will not be disturbed."

The same quotation is applicable to the case at bar except that the period that the rule has been the law of Pennsylvania should now be increased to over 75 years.

It is to be noted that the above line of cases is unbroken. No case to the contrary involving a deed or other private instrument has been cited by the defendants. The foregoing cases may therefore confidently be relied upon as establishing that in Pennsylvania the word "mineral" in a deed does not include gas.

It is to be noticed at this point that the decisions mentioned refer to exceptions and reservations contained in deeds which sever a "mineral" from the fee. The decisions uniformly hold that such a clause is construed most strongly against the grantor, it being his language. Defendants assert that as the Caledonia Coal Company deed is a grant of "minerals" only, it is likewise to be construed most strongly against the

grantor. This court agrees with that general construction of the phraseology, but it still does not assist defendants. Judge Pentz of the Clearfield County Common Pleas Court in an unpublished opinion filed December 19, 1958, in Highland, et al. v. Commonwealth of Pennsylvania, et al., No. 366 November Term, 1957, rejected the argument that the word "mineral" includes gas when used in the granting clause of a deed, notwithstanding that it has been held that it does not apply to gas when used in a reserving or excepting clause of a deed. As a matter of reasoning and logic, there can be no difference in the result reached, because in both a grant and in a reservation, the instrument is construed most strongly against the grantor.

Defendants cite Yuscavage v. Hamlin, 391 Pa. 13, 137 A.2d 242, 243, decided in 1958, as authority for the proposition that the habendum clauses in the Caledonia Coal Company deed and other deeds must be given effect and that under the conveyances mentioned in defendants' chain of title, the habendum clauses show that title to the gas passed. But this court does not believe that the decision cited goes as far as defendants assert. The language used was, "All the surface and right of soil" in two tracts of land. But as the court says, "It must be remembered that the coal here had already been reserved and removed, and we are convinced that the term 'surface' was employed in contemplation of that severance only." The point to be emphasized is that the granting clauses in the Caledonia and in the other deeds mentioned in the findings of fact have been construed a certain way in the Pennsylvania decisions. Of the many decisions on this point, none favor defendants.

It is noticed, also, with regard to the rebuttable presumption, that gas was not intended to have been included in the phraseology of the Caledonia Coal Company deed, in the clause commencing with " * * * Together with * * * " The language is, " * * * to erect such structures, ways, buildings, railways, and shafts thereon both up and down, to cut and fill the surface wheresoever needed for railways, for such purposes to dig ditches and channels for waste waters * * *." and so forth, all of which language seems to this court appropriate to coal and clay operations rather than any drilling operations for natural gas. Other evidence indicates that the subject matter of the deed was coal. The consideration is recited as $16,618. The assessment records after the Caledonia Coal Company deed was executed indicate for 1889 that the Bowman interests were assessed at $5,445, and the Caledonia Coal Company "minerals" at a dollar per acre, as the acreage is given as 1,089 and the valuation is fixed at $1,089. But in 1896 and 1897, the Bowman valuation had been reduced to $3,294, and the mineral estate assessed to Caledonia Coal Company raised to $5,445. Thus the deed and the other evidence indicates that the parties were dealing with coal and not natural gas, which was not, of course, produced at all in that warrant until 1957.

II. Whether the "Mineral" Assessments and Tax Sales Followed by Treasurer's Deeds Passed Title to the Natural Gas.

Following the execution of the Caledonia Coal Company deed, the first separate assessment occurred in 1889. In that year Warrant 2001, 1,089 acres, was assessed to Benjamin C. Bowman. However, the same acreage in the warrant "mineral" was assessed to Caledonia Coal Company. The same assessments carried through 1890, '91, '92, '93 and '94. However, in 1895, in the assessment to Benjamin C. Bowman and Company, the land was described as "surface" and the Caledonia Coal Company assessment was "mineral."

The assessments for 1896 and 1897 are especially important to note, because tax sales occurred and Treasurer's deeds were thereafter executed. The point to be observed is that in those two years

the Bowman assessment did not say "surface," nor was there anything appearing thereon to indicate that it was less than a fee or less than all property rights in the land. The assessments for 1896 and 1897 appear as follows:

The B. C. Bowman & Company assessments:

For the year 1896

```
"Assessed To.: B. C. Bowman & Co. .
Warrant No.: 2001
Acres : 1089
Warrantee : Robt. Fox
Valuation : $3,294."
```

For the year 1897

```
"Assessed To: B. C. Bowman & Co.
Warrant No.: 2001
Acres : 1089
Warrantee : Robt. Fox
Valuation : $3,294"
```

The Caledonia Coal Company assessments:

For the year 1896

```
"Assessed To: Caledonia Coal Co.
Warrant No.: 2001
Acres : 1089 mineral
Warrantee : Robt. Fox
Valuation : $5,445."
```

For the year 1897

```
"Assessed To: Caledonia Coal Co.
Warrant No.: 2001
Acres : 1089 mineral
Warrantee : Robt. Fox
Valuation : $5,445."
```

The taxes for 1896 and 1897 were unpaid, both by Bowman and by the Caledonia Coal Company, so that the land went to separate sales on the two assessments for nonpayment of taxes. The Bowman title was conveyed by the Treasurer of Clearfield County by deed of September 28, 1898, to J. Roman Way for nonpayment of the 1896 and 1897 taxes. This deed was duly acknowledged in open court. On the same date, the Treasurer conveyed the interest of the Caledonia Coal Company under the "mineral" assessment to H. H. Pigott for nonpayment of taxes for the years 1896 and 1897. Defendants say that because the assessment record under Caledonia Coal Company was for the "mineral," title to the gas passed under the Treasurer's deed. On this point both parties cite Wilson v. A. Cook Sons Co., 298 Pa. 85, 148 A. 63. Defendants contend also, that because the word "mineral" is a generic term and includes natural gas,

that gas was included in the assessment under the Pennsylvania decisions and therefore title to it passed under the Treasurer's deed. It seems to this court that what Mr. Justice Gordon said in 1882 in Dunham v. Kirkpatrick, supra, in speaking of petroleum is equally applicable in the present case:

"* * * It is true that petroleum is a mineral; no discussion is needed to prove this fact. But salt and other waters, impregnated or combined with mineral substances, are minerals; so are rocks, clays and sand; anything dug from mines or quarries; in fine, all inorganic substances are classed under the general name or [sic] minerals: [Citing cases.]"

See also 58 C.J.S. Mines and Minerals § 2, page 17.

A careful reading of Wilson v. A. Cook Sons Co., supra, shows that the decision favors plaintiff in the instant case. The subject matter of the dispute was the oil and gas under the land. That was the only thing reserved in the deed in question. On the tax duplicates the reserved oil and gas estate was described as "mineral" and was assessed and sold as such. The court held that such an assessment, based on the reservation of oil and gas, followed by a tax sale and Treasurer's deed, carried title to the oil and gas. The court said, 298 Pa. on page 90, 148 A. on page 64:

"* * * There was undoubtedly a separate estate here created in plaintiff of the underlying minerals, and we have frequently held that oil and gas are minerals, (Marshall v. Mellon, 179 Pa. 371, 36 A. 201, 35 L. R.A. 816; Chartiers Block Coal Co. v. Mellon, 152 Pa. 286, 25 A. 597, 18 L.R.A. 702); and like all minerals, they necessarily belong to the owner of the fee or his grantee, the former having an ownership which he can sell and convey. Hamilton v. Foster, 272 Pa. 95, 11 A. 50. * * *"

██ Unquestionably in the Caledonia Coal Company deed a separate estate was created in some of the "minerals" underlying the land. That was the very subject of the transaction. The estate created in the Caledonia Coal Company was assessed on the tax duplicates of Clearfield County as "mineral," but keeping in mind that an assessment remained in Bowman for the years 1896 and 1897, which included everything not conveyed, the mineral assessment to Caledonia Coal Company cannot be held to have included the natural gas. That was not a property right which passed to Caledonia Coal Company in its deed. In Wilson v. A. Cook Sons Co., supra, the subject matter of the reservation was included in the "mineral" assessment. Following that same principle, it must be held that the assessment to Caledonia Coal Company only included that which it acquired, that is, coal, coal oil, fire clay and so forth. Therefore, the Treasurer's deed of September 28, 1898, to H. H. Pigott did not pass title to the natural gas.

 This court agrees with plaintiff that it is but elementary that only the estate assessed passes at a tax sale. See Proctor v. Sagamore Big Game Club, 3 Cir., 265 F.2d 196, Footnote 4, handed down March 24, 1959. The title acquired by the purchaser at a tax sale is limited to what was covered by the assessment on which the tax sale was based. That is true both as to unseated land (Miller v. McCullough, 104 Pa. 624; Babcock Lumber Co. v. Faust, 156 Pa.Super. 19, 39 A.2d 298) and seated land (Brundred v. Egbert, 164 Pa. 615, 30 A. 503). In the Babcock case, which involved unseated land, the court said:

"The lien for unpaid taxes attaches only to the estate assessed, and that estate, but no more, passes at a public sale even though the authorities assume to convey land against which there had been no valid assessment." [156 Pa.Super. 19, 39 A.2d 302.]

In Brundred v. Egbert, supra [164 Pa. 615, 30 A. 505], the same principle was expressed as follows:

"In tax sales, as in judicial sales the sale is the method of enforcing a lien. What shall pass under the sale depends upon what was bound by the lien. The extent of the lien in tax cases must depend upon the assessment; for the lien of unpaid taxes is coextensive with the tract against which they were assessed. The question in this case was therefore, as we held in [Brundred v. Egbert] 158 Pa. 552, 28 A. 142, against what land were the taxes assessed? Upon that land the lien attached. To that land the tax sale passed the title."

There are many other cases in Pennsylvania so holding: Fager v. Campbell, 5 Watts, Pa., 287; Irwin v. Bank of U. S., 1 Pa. 349; Logan v. Washington County, 29 Pa. 373; and Boulton v. Starck, 369 Pa. 45, 85 A.2d 17.

▉ What estate was assessed is a question of fact: Harper v. McKeehan, 3 Watts & S., Pa., 238, 246; Woodside v. Wilson, 32 Pa. 52, 54; Hess v. Herrington, 73 Pa. 438, 447; Fisk v. Corey, 141 Pa. 334, 347, 21 A. 594; Brundred v. Egbert, supra.

A further point requires some discussion. On December 29, 1904, J. Roman Way gave a deed of this warrant to the Commonwealth in which he made a reservation of the coal, coal oil, gas, fire clay and other minerals. It is apparent from an inspection of this deed that the word "gas" was inserted after the deed had been prepared, but before it was executed. A notation after the signature appears as follows:

"The word 'Gas' beween 23 & 24 lines from top of 3rd page interlined before signing. Also the words 'by, from, or under, him, them or any of them' between 23 & 24 lines from top of 4th page interlined before signing.

"William L. Waltz"

The above notation is quoted simply to show that the parties to the foregoing deed specifically had in mind that gas was being reserved.

On the same date, December 29, 1904, J. Roman Way conveyed the so-called "minerals" specifically including gas to Cyrus Gordon. By these two deeds, J. Roman Way conveyed the title of the surface to the Commonwealth and the gas to Cyrus Gordon. As mentioned, there has never been any separate assessment of the gas as such. The query at this point is whether the gas estate after 1904 is embraced in the "mineral" assessment in the name of the Caledonia Coal Company. This court does not believe that the gas can be included in the "mineral" assessment to Caledonia Coal Company. It is to be recalled that that assessment commenced in 1889 and is a continuous assessment from that time to the present, but in the name, of course, of the successors in title to the Caledonia Coal Company.

▉ It has long been the law of Pennsylvania that where there is a separate ownership of oil, gas and minerals in a tract of unseated land, such mineral right may be separately assessed for tax purposes. Rockwell v. Keefer, 39 Pa. Super. 468. But it is to be noticed likewise that the mere naked conveyance or reservation of oil or gas in a deed without any other facts to base a valuation upon is not sufficient to warrant the assessment for taxes. Rockwell v. Warren County, 228 Pa. 430, 77 A. 665, 666, is an appeal of the decision from the Superior Court just cited. The Supreme Court of Pennsylvania carefully discusses the factors which require that oil and gas be assessed. The court says:

"* * * Development in the neighborhood, sales of oil or gas lands in close enough proximity to add value, or any other element of value which may form a basis of valuation may be taken into consideration by the assessor or other taxing authorities, but it should always be borne in mind that real estate is the thing being dealt with, and that

oil and gas are considered real estate and if there be no oil and gas, then there is no real estate to be taxed."

The Supreme Court's language is particularly appropriate to the facts in the instant case. Plaintiff's evidence indicates that there was no known value in the gas in this warrant until very recently. In any event, an owner does not lose title by virtue of failure to have his gas assessed. Any failure to have property assessed might be the subject of contention between the taxing authorities and the owner, but does not assist a stranger to the title claiming ownership. Such is the position that defendants find themselves in with reference to the gas in this warrant. The conclusion of this court is, then, that as the gas estate did not automatically nor by any other method become embraced in or included in the Caledonia Coal "mineral" assessment, title to the gas did not pass on the various tax sales based on the "mineral" assessment and therefore the Cyrus Gordon heirs still hold the title to the gas, subject to plaintiff's leasehold. Under the evidence in the case, defendants' predecessors in title never did acquire ownership of the natural gas in this warrant.

The foregoing is regarded as the opinion of this court on the essential issues which must be decided, but specifically the court makes the following findings of fact in order that the paper chain of title of both plaintiff and defendants may be fully shown; the court rejecting, however, in its conclusions, defendants' chain of title purporting to convey to defendants title to the natural gas:

### Findings of Fact

1. For approximately 20 years prior to April 5, 1887, Benjamin C. Bowman and J. H. Rowland owned Warrant 2001 and all property rights therein in Houston Township, Clearfield County, Pennsylvania, in fee simple.

2. On April 5, 1887, Bowman and Rowland conveyed to the Caledonia Coal Company by special warranty deed "All the Coal, Coal Oil, Fire Clay and other minerals of every kind and character in upon and under" Warrant 2001 and other lands. This deed also contained the following clause: "together with the right and privilege of entering upon said land and taking away said coal, coal oil, fire clay and other minerals of every kind and character and to erect such structures, ways, buildings, railways and shafts thereon both up and down, to cut and fill the surface wheresoever needed for railways for such purposes to dig ditches and channels for waste waters and to do those and such other things thereon in such manner as may be necessary in the Judgment of the Caledonia Coal Company to successfully mine and take way the said Coal, Coal Oil, Fire Clay and other minerals or any of them from the lands aforesaid with the right to use such timber under ten inches in diameter at the butt as may be needed in mining operations." Exhibit A is a correct copy of this deed.

3. Prior to the assessment year of 1889 there had been but one assessment of Warrant 2001, and that was against B. C. Bowman. In 1889 and several years thereafter, there were two separate assessments of this Warrant: one against Bowman, but designated "surface," and the other against Caledonia Coal Company designated "mineral." But for the years 1896 and 1897, the Bowman assessment was unlimited or uncharacterized, and the Caledonia Coal Company assessment was again "mineral." The above assessments for any interest in Warrant 2001 are correctly shown by Exhibits 19 to 30, inclusive, from 1847 until 1957, inclusive.

4. On September 28, 1898, the Treasurer of Clearfield County conveyed the interest of Bowman and Rowland in Warrant 2001 to J. Roman Way for unpaid taxes of 1896 and 1897. Exhibit 1 is a correct copy of this deed.

5. Also on September 28, 1898, the Treasurer of Clearfield County conveyed the interest of Caledonia Coal Company, referred to therein as "Mineral" in Warrant 2001 to H. H. Pigott, who was act-

ing as a trustee for Caledonia Coal Company, for unpaid taxes of 1896 and 1897. Exhibit 11 is a correct copy of this deed.

6. On March 11, 1899, the Caledonia Coal Company and H. H. Pigott conveyed all that they owned in Warrant 2001, as well as many other properties, to Isaac F. Richey, et al., as liquidating trustees for Caledonia Coal Company. Item XIII of this deed refers to Warrant 2001 and uses the same granting language as in the deed from Bowman and Rowland to the Caledonia Coal Company of April 5, 1887, referred to in Finding of Fact No. 2 above and refers to that deed for what is being conveyed by that item. Exhibit H is a correct copy of this deed.

7. On June 25, 1900, Isaac F. Richey, et al., the liquidating trustees of the Caledonia Coal Company, conveyed all of the property which they owned to N. T. Arnold. Item XIII of this deed refers to Warrant 2001 and uses the same granting language as in the deed from Bowman and Rowland to the Caledonia Coal Company of April 5, 1887, referred to in Finding of Fact No. 2 above and refers to that deed for what is being conveyed by that item. Exhibit J is a correct copy of this deed.

8. On July 19, 1900, J. Roman Way quitclaimed to Isaac F. Richey, et al., trustees, any interest in the "coal, coal oil, fire clay and other minerals of every kind and character in, upon and under," *inter alia*, Warrant 2001. J. Roman Way had no interest in the things mentioned and therefore said deed was merely a disclaimer and did not detract from what he owned or add to the title of Isaac F. Richey, et al. Exhibit G is a correct copy of this deed.

9. On September 25, 1901, N. T. Arnold conveyed an undivided ⅕ interest to J. Henry Beadle "of all coal underlying," *inter alia*, Warrant 2001. Exhibit L is a correct copy of this deed.

10. Also on September 25, 1901, N. T. Arnold conveyed an undivided ⅖ interest to W. H. Osterhout "of all coal underlying", *inter alia*, Warrant 2001. Exhibit K is a correct copy of this deed.

11. On November 29, 1904, Rowland and the heirs of Bowman, who had died in the meantime, gave a quitclaim deed to J. Roman Way for "All their right, title and interest in and to," *inter alia*, Warrant 2001. Exhibit 2 is a correct copy of this deed. This deed vested in J. Roman Way all of the rights in the surface and gas which Bowman and Rowland retained after their conveyance to the Caledonia Coal Company in 1887, if those rights had not previously been fully acquired by J. Roman Way by the Treasurer's deed, Exhibit No. 1, referred to in Finding of Fact No. 4 above.

12. On December 29, 1904, J. Roman Way conveyed the surface to the Commonwealth of Pennsylvania. This deed expressly reserved the coal, coal oil, fire clay and other minerals, which Way never owned, and the gas. This deed recited Exhibits 1 and 2 referred to in Findings of Fact Nos. 4 and 11, respectively, as links in the chain of title. Exhibit I is a correct copy of this deed.

13. Also on December 29, 1904, J. Roman Way conveyed any gas under, *inter alia*, Warrant 2001 to Cyrus Gordon. This deed recites that the surface was simultaneously being conveyed to the Commonwealth of Pennsylvania and recited Exhibits 1 and 2 referred to in Findings of Fact Nos. 4 and 11, respectively, as links in the chain of title. Exhibit 3 is a correct copy of this deed.

14. Ever since December 29, 1904, the surface of Warrant 2001 has belonged to the Commonwealth of Pennsylvania and the gas estate to Cyrus Gordon or his heirs. Said heirs gave an oil and gas lease on, *inter alia*, Warrant 2001 to Godfrey L. Cabot, Inc., on July 1, 1951, which has been assigned by said lessee to the plaintiff in this case. Exhibits 6 and 7 are correct copies of the lease from the Gordon heirs to Godfrey L. Cabot, Inc., and Exhibit 8 is a correct copy of the assignment to the plaintiff.

15. On February 26, 1909, the executors of N. T. Arnold petitioned the Orphans' Court of Elk County to sell all of his real estate for payment of debts. The executors attached as Schedule C to

said petition a description of "all of the real estate" of said N. T. Arnold of which they knew. In Item III of said Schedule the executors described Arnold's remaining interest in Warrant 2001 as follows: "The undivided two-fifths interest in all the coal, coal oil, fire clay, and other minerals of every kind and character," without any reference to gas, exactly as in the deed from Bowman and Rowland to Caledonia Coal Company of April 5, 1887, referred to in Finding of Fact No. 2 above. Exhibit 37 is a correct copy of this petition.

16. On May 31, 1909, N. T. Arnold's executors conveyed the remaining ⅖ interest which he had in Warrant 2001 to B. F. Thompson, using the same description as that quoted in the preceding Finding of Fact. The reference to Warrant 2001 in this deed is in Item III. Exhibit M is a correct copy of this deed.

17. On February 23, 1910, B. F. Thompson conveyed many coal properties, including all that he had acquired in Warrant 2001 by Exhibit M, to the Penfield Coal & Coke Company. Exhibit N is a correct copy of this deed.

18. On March 1, 1910, Penfield Coal & Coke Company mortgaged all of its property to Guarantee Title and Trust Company, including its ⅖ interest in the "coal, coal oil, fire-clay and other minerals of every kind and character" in Warrant 2001, without any mention anywhere of gas. Exhibit 18 is a correct copy of this mortgage.

19. Referring to Warrant 2001, in 1899 and 1900 there was an assessment against B. C. Bowman & Company for "Surface" and against Caledonia Coal Company for "Mineral." (See Exhibit 29.) In 1901 the "Surface" assessment was transferred from B. C. Bowman & Company to J. Roman Way, and the "Mineral" assessment was transferred from the Caledonia Coal Company to N. T. Arnold. (See Exhibit 28.) In 1902, 1903 and 1904 there was a "Surface" assessment against J. Roman Way and a "Mineral" assessment against N. T. Arnold. (See Exhibits 19, 20 and 29.)

After the name of N. T. Arnold in the Assessment Record for 1904, there appear the words "coal, coal oil, fire clay and other mineral and mining rights." (See Exhibit 20.)

20. After 1904 there was no further "Surface" assessment. From 1905 until 1910, inclusive, the only assessment involving Warrant 2001 was a "Mineral" assessment against N. T. Arnold or his estate. (See Exhibits 28 and 29.) From 1911 until 1924, inclusive, the only assessment involving Warrant 2001 was a ⅖ interest "Mineral" assessment against Penfield Coal & Coke Company. (See Exhibits 28 and 29.)

21. In 1925 there were three assessments involving Warrant 2001, as follows:

Against L. W. Smith, Receiver for Penfield Coal & Coke Company for a ⅖ interest in "Mineral only"

Against Robert H. Beadle of a ⅕ interest in "Mineral only"

Against Union Trust Company of Pittsburgh of a ⅖ interest in "Mineral only."

After each of the last two assessments there appears in parentheses "From Penfield Coal & Coke Co." Exhibits 21 and 22 are correct photographic copies of pages 267 and 268 of the Assessment Record of Huston Township for Unseated Lands showing the aforesaid assessments.

22. On October 26, 1928, the ⅕ interest in "Mineral only" assessed to Robert H. Beadle was conveyed for nonpayment of the 1927 taxes by the County Treasurer to the County Commissioners. Exhibit S is a correct copy of this deed.

23. Also on October 26, 1928, the ⅖ interest in "Mineral only" assessed to Union Trust Company of Pittsburgh (formerly owned by Osterhout) was conveyed for nonpayment of the 1927 taxes by the County Treasurer to the County Commissioners. Exhibit O is a correct copy of this deed.

24. In 1928 the assessments involving Warrant 2001 were as follows:

Against J. H. Beadle Estate of a ⅕ interest in "Mineral." This assessment appears on page 226 of the Assessment Record, has a line drawn through it and a notation at the bottom "To Robert H. Beadle."

Against W. H. Osterhout Est. of a ⅖ interest in "Mineral." This assessment appears on page 227 of the Assessment Record, has a line drawn through it and a notation at the bottom "To Union Trust Co. Pittsburg."

Against L. W. Smith, Receiver for Penfield Coal & Coke Co., of a ⅖ interest in "Mineral only."

This appears on page 230 of the Assessment Record.

Against Robert H. Beadle of a ⅕ interest in "Mineral only" with two notations thereafter reading "From Penfield Coal & Coke Company" and "Sold to County 1928. Do Not Assess." This appears on page 231 of the Assessment Record.

Against Union Trust Company of Pittsburgh of a ⅖ interest "Mineral only,"

with two notations thereafter reading "From Penfield Coal & Coke Co." and "Sold to County 1928. Do Not Assess." This appears on page 232 of the Assessment Record. 1928 was a triennial assessment year. Exhibits 23 to 27, inclusive, are correct photographic copies of pages 226, 227, 230, 231 and 232, respectively, of the 1928 Assessment Record of Huston Township for Unseated Lands.

25. In 1929 and 1930 the only assessment involving Warrant 2001 was against L. W. Smith, Receiver for Penfield Coal & Coke Company, of a ⅖ interest in "Mineral only." (See Exhibit 29.) The same was true in 1931, but there is a notation after said assessment in the Assessment Record reading "Sold to County 1932. Do Not Assess." (See Exhibits 28 and 29.)

26. On September 15, 1932, the ⅖ interest in "Mineral only" assessed to L. W. Smith, Receiver for Penfield Coal & Coke Company, was conveyed for non-payment of the 1930 and 1931 taxes by the County Treasurer to the County Commissioners. Exhibit X is a correct copy of this deed.

27. On December 30, 1936, the County Commissioners conveyed to A. H. Reitz the "⅕ Int. 1135 A. Mineral only, Warrant No. 2001 sold as the property of Robert H. Beadle." Exhibit T is a correct copy of this deed.

28. On September 19, 1939, the ⅕ interest in "Mineral only" assessed to A. H. Reitz was conveyed for nonpayment of the 1937 taxes by the County Treasurer to the County Commissioners. Exhibit U is a correct copy of this deed.

29. On July 9, 1945, the County Commissioners conveyed to Mark Reiter the ⅕ interest in "Mineral" which had been sold as the property of A. H. Reitz. Exhibit V is a correct copy of this deed.

30. On August 27, 1945, a "Supplemental Assessment" for 1945 taxes was made against Mark Reiter for said ⅕ "Mineral" interest. Exhibit 30 is a correct copy of said Supplemental Assessment. On September 9, 1948, said ⅕ "Mineral" interest of Mark Reiter purportedly was conveyed by the County Treasurer to J. S. and A. H. Reitz for nonpayment of the 1945 taxes imposed by the aforesaid Supplemental Assessment. Exhibit W is a correct copy of this deed.

31. In 1946, 1947, 1948 and 1949 a ⅕ interest in "Mineral" in Warrant 2001 was assessed against Mark Reiter. In 1950 there was a similar assessment, but it was stricken out and a notation placed at the end of the assessment reading "Sold to County November 2, 1949. Do Not Assess." (See Exhibit 28.)

32. On November 2, 1949, the ⅕ "Mineral" interest of Mark Reiter was sold to the County Commissioners for nonpayment of taxes. On December 27, 1951, Mark Reiter redeemed said ⅕ "Mineral" interest. (See Exhibit 12.)

33. In 1952 and every year since then a ⅕ "Mineral" interest in Warrant 2001 has been assessed against Mark Reiter. (See Exhibit 28.) The taxes on said ⅕

"Mineral" interest for 1952 and every subsequent year have been paid by said Mark Reiter. (See Exhibits 13, 33, 34, 35 and 36.)

34. On November 15, 1951, Mark Reiter gave an oil and gas lease on his ⅕ interest in Warrant 2001 to Godfrey L. Cabot, Inc. Exhibit 31 is a correct copy of said Lease. On March 15, 1957, said lease was assigned by Godfrey L. Cabot, Inc., to the plaintiff. Exhibit 32 is a correct copy of said assignment.

35. On December 30, 1936, the County Commissioners conveyed to Harry Boulton the "⅖ Int. 1135 A. Mineral only in Warrant 2001 sold as the property of Union Trust Co., of Pittsburgh." Exhibit P is a correct copy of this deed. This was the ⅖ interest in the coal originally conveyed by N. T. Arnold to W. H. Osterhout by Exhibit K, referred to in Finding of Fact No. 10 above.

36. In 1937 a ⅖ interest in "Mineral only" was assessed to Harry Boulton. There are two notations after this assessment, one reading "Sold as Prop Union Trust Co of Pittsburg at Comrs. Sale 1936" and the other reading "Sold to County 1938. Do Not Assess." (See Exhibits 28 and 29.)

37. On September 19, 1939, the ⅖ "Mineral" interest of Harry Boulton was conveyed by the County Treasurer to the County Commissioners for nonpayment of 1937 taxes, the sale having taken place on June 20, 1938. Exhibit Q is a correct copy of this deed.

38. On July 9, 1945, the County Commissioners conveyed to J. S. and A. H. Reitz the ⅖ interest in "Mineral" which had been sold as the property of Harry Boulton. Exhibit R is a correct copy of this deed. This was the ⅖ interest in coal originally conveyed by N. T. Arnold to W. H. Osterhout by Exhibit K, referred to in Finding of Fact No. 10 above.

39. On May 25, 1942, the County Commissioners conveyed to A. H. Reitz the "⅖ Int. 1135 A. Min. only barren. Warrent No. 2001 sold as the property of L. W. Smith, Receiver, Penfield Coal

& Coke Co." Exhibit Y is a correct copy of this deed.

40. On December 10, 1956, A. H. Reitz gave an oil and gas lease on, *inter alia,* Warrant 2001 to Swan-Finch Gas Development Corporation. Exhibit Z is a correct copy of this lease. On December 31, 1956, said lease was assigned by Swan-Finch Gas Development Corporation to Keta Gas & Oil Company. Exhibit JJ is a correct copy of this assignment.

41. It was not the intention of the parties to convey the gas by the deed from Bowman and Rowland to the Caledonia Coal Company dated April 5, 1887.

42. The "Mineral" assessments involving Warrant 2001 which began in the name of the Caledonia Coal Company in the triennial assessment for the year 1889 and which continued against the successors in title of the Caledonia Coal Company were not intended to and did not include the natural gas. Among those assessments are (1) the assessments for 1896 and 1897 for nonpayment of the taxes on which the interest of the Caledonia Coal Company was sold to H. H. Pigott by the County Treasurer's deed of September 28, 1898; (2) the assessment for 1927 for nonpayment of the taxes on which the ⅕ interest of Beadle was sold to the County Commissioners by the County Treasurer's deed of October 26, 1928; (3) the assessment for 1927 for nonpayment of the taxes on which the ⅖ interest of Osterhout was sold to the County Commissioners by the County Treasurer's deed of October 26, 1928; (4) the assessments for 1930 and 1931 for nonpayment of the taxes on which the ⅖ interest of Penfield Coal & Coke Company was sold to the County Commissioners by the County Treasurer's deed of September 15, 1932; and (5) the assessment of 1945 for nonpayment of the taxes on which the ⅕ interest of Reiter was sold to J. S. and A. H. Reitz by the County Treasurer's deed of September 8, 1948.

43. Exhibit 9 is a correct drawing of Warrant 2001 showing the wells which had been drilled and started on said

Warrant at the time when this suit was commenced. Exhibit 38 is a correct drawing of the same Warrant showing the six wells which have been drilled on said Warrant to date by the plaintiff and the gathering lines from them.

44. The first well ever drilled on Warrant 2001 was the plaintiff's well designated N–540, which was begun on December 27, 1956, and completed on February 20, 1957.

45. There was no basis for believing that there actually was gas under Warrant 2001 or for evaluating or assessing gas under that Warrant until well N–505 on Warrant 4193, which adjoins Warrant 2001 on the south and which is shown on Exhibit 10, was completed by the plaintiff on December 12, 1956.

46. Exhibit 39 is an official map correctly showing the location of Warrant 2001 and all the wells which had been drilled prior to December 31, 1956, into the only material sand in the territory shown on said map. The first well shown on said map which was drilled is that designated No. 1 in black in the Benezette quadrant, and that was brought in on January 5, 1953. In 1953 the consensus of opinion among gas experts was that the Oriskany Sand, the only material gas-bearing sand in the general area, did not extend under Warrant 2001, but ended southeast of that Warrant, as shown on Exhibit 39.

47. But for the process of hydraulic fracturing which was invented about 1949 and first used in Pennsylvania in 1954, no gas in productive or commercial quantities would have been discovered in or produced from Warrant 2001 or Huston Township.

48. Beginning in September, 1957, the plaintiff and its lessors tried to have the gas estate under Warrant 2001 assessed for local real estate tax purposes, but the county authorities refused to assess it, at least until after the termination of this litigation.

Conclusions of Law

1. This court has jurisdiction of the parties and of the subject matter of the litigation, the value of the natural gas in the warrant exceeding the sum or value of $3,000; the Complaint having been filed February 25, 1957.

2. The deed from Bowman and Rowland to the Caledonia Coal Company dated April 5, 1887, did not convey any gas under Warrant 2001.

3. The gas estate in Warrant 2001 remained in Bowman and Rowland until September 28, 1898, when it was sold at a tax sale to J. Roman Way and remained in him until he conveyed it on December 29, 1904, to Cyrus Gordon. Since then the gas estate has continuously belonged to Cyrus Gordon and his heirs, except for the lease thereof which said heirs gave to Godfrey L. Cabot, Inc., on July 1, 1951.

4. The assessments on which the tax sales were based under which the defendants claim did not include the gas estate in Warrant 2001 and therefore title to the gas did not pass by any of those tax sales.

5. The plaintiff owns the only valid gas lease on Warrant 2001 and has the sole right to produce gas from under said Warrant.

6. The defendants, their servants and other representatives, will be permanently enjoined from drilling for gas on Warrant 2001; from producing or marketing gas from said Warrant; and from interfering in any way with the plaintiff's possession and enjoyment of its oil and gas leasehold upon said Warrant.

Settle order on notice.